## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. BRAZIEL.*

### No. 3872.

Court of Civil Appeals of Texas. Texarkana.
July 10, 1930.

Rehearing Denied July 17, 1930.

*Writ of error granted.

653

Marsh & McIlwaine and Ramey & Marsh, all of Tyler, for appellant.

Butler, Price & Maynor, of Tyler, and J. A. Mallory, of Lindale, for appellee.

WILLSON, C. J. (after stating the case as above).

The contentions of appellant will be disposed of in the order in which they are presented in its brief.

■ 1. It is insisted the judgment should be reversed because the court erred, appellant says, when he overruled its motion for a new trial on the ground that the jury was guilty of misconduct in that "in their deliberation (quoting) before arriving at a verdict" they "mentioned and/or discussed attorneys' fees." At the hearing on said motion four of the jurors testified as witnesses. It appeared from their testimony that the matter of attorneys' fees was mentioned by one of their number, but it further appeared that there was no discussion of such matter and that the jurors who testified, at least, were not influenced to find as they did by the mention of attorneys' fees. We think the trial court had a right to conclude that the action of the other eight jurors also was not influenced by the mention of attorneys' fees and to overrule the motion as he did.

■ 2. If the findings numbered "6" and "10" in the statement above were conflicting, as appellant contends, and we agree (but see Inman v. Ry. Co. [Tex. Com. App.] 288 S. W. 150, Id. [Civ. App.] 293 S. W. 650) they were, the fact would not require a reversal of the judgment, for if those findings operated only to nullify each other, there still would be ample support for the judgment in other findings referred to in said statement.

■ 3. At the trial appellee's witness Robert Wright on his direct examination testified that at the time of the collision appellant's train was moving faster than six miles per hour. In a written statement made to appellant's claim agent before the time of the trial, it appeared Wright had declared he "was a poor judge of speed." Confronted with the statement on his cross-examination, Wright testified that at the time he made same he told the claim agent the train was moving faster than six miles an hour, and that the agent remarked that he (Wright) "was a poor judge of speed and he would just put it down that way."

In arguing the case counsel for appellant insisted the jury should discredit the testimony of Wright as to the speed of the train because of the declaration in the statement to the claim agent. In that attitude of the case, counsel for appellee in closing the argument said:

"Why does the railroad company not bring this claim agent who took this statement and put him on the stand to contradict this boy's testimony? Gentlemen, I'll tell you why they do not. They dare not put the claim agent on the stand because when he hits the stand they know he becomes a witness for all purposes."

The claim agent was present during the trial, but did not testify as a witness. It is insisted that the assertion of appellee's counsel "that appellant dared not put the claim agent on the stand to contradict Wright's testimony because when they did so he became a witness for all purposes" "was highly improper and flagrantly wrong" conduct on the

part of appellee's counsel, entitling appellant to a new trial, and that the trial court erred when he overruled its motion on that ground. The contention is overruled, as is also a like contention as to further argument by appellee's attorney referred to in the statement following:

Appellant's employee June Whitney saw the collision. His testimony as a witness for appellant, if believed by the jury, would (perhaps) have required them to find in appellant's favor. He testified he was interested in the outcome of the case, that he owed his livelihood to appellant, and felt like he owed it his service as a witness. It appeared he had gone out of his way to make observations and measurements "to make a witness out of himself," the court said in qualifying a bill of exceptions. After Whitney had testified, T. D. Berry, who for 27 years had worked for appellant as an engineer, testified as a witness for appellee. In walking to and from the witness stand Berry limped and appeared to be lame. Appellant's counsel's cross-examination of Berry was "very caustic," the court said in qualifying said bill, and showed that Berry had sued appellant "for a large sum of money and had compromised for a small sum." In arguing the case for appellant, H. B. Marsh, one of its counsel, said:

"That he admired June Whitney for his loyalty to the railroad company; that the railroad company always treated their loyal employés fairly, and," the court said in his qualification of the bill, "Mr. Marsh severely arraigned plaintiff's witness, T. D. Berry, before the jury on account of his testimony, and Mr. Marsh further stated to the jury that he had represented the railroad company for about 40 years and he thought as much of the railroad company as he did, almost, of one of his own children."

In closing the argument to the jury one of appellee's counsel said:

"June Whitney is the most partisan witness I have ever seen on the witness-stand. Mr. Marsh tells you that June Whitney is a loyal employé of the defendant and that he should be loyal because he is earning his daily bread from that company and receiving good treatment from them. But I tell you the company cares nothing for June Whitney. Oh, yes, they dearly love their employés. You gentlemen saw poor old Tom Berry, limp and lame, thrown on the scrap heap after 27 years of faithful service."

■ 4. The contention remaining undisposed of is that the judgment is for an excessive amount. With reference to the nature and effect of injuries he suffered, appellee as a witness testified as follows:

"My nose was split open here, a gash split here in my temple, a skinned place here about that long, and another place right on top of my head. There was a knot on this knee the size of a hen egg. This ankle was cut just a half moon plumb to the bone. This knee was all skinned here. My face was all skinned, and my arm was cut in here with glass, and all this was bruised from here to there. Right here on this hip there was a place just as black and large as this spittoon. Right in the middle of my back there was a place just about that size. There were two ribs broken back there. I suffered severe pain from that. For two weeks I couldn't turn myself in my bed. There was something wrong with my urine. When I came to myself it was about 5 o'clock Saturday evening and I wanted to urinate and there was blood; thick blood. That was the first time I noticed the blood. I continued to pass blood twenty-five days. I was in bed continuously a month. After that then for thirty days I would sit up an hour or two during the day and then had to go back to bed. It was about sixty or seventy days before I was able to go to my office. Then I was not able to remain at the office all day. I didn't feel like it. I was aching and hurting; pain in my back. It was about three or four months before I was able to resume my work at my office as I had previously. I had several injuries to my head. It was three or four months before this place here healed up. Looked like there was proud flesh in there; ran all the time; this place on my temple. I had pains in my head. The first three weeks there wasn't any feeling in this part of my head at all; looked like it was wood. It was so sore I couldn't comb my head on that side; couldn't touch it for at least thirty days. I have not fully recovered from that. My back hurts me. I can't pick up anything; can't stoop down and pick up anything that weighs forty or fifty pounds. And my back—I will maybe go for a week or two weeks and feel pretty good and then catch me and I can't pull my shoulder up like that. My back doesn't stay that way all the time. It comes and goes, but it hurts me some all the time, but when it comes on about every week or two weeks, something like that, it lasts me from three to eight days. Prior to the time I received these injuries I had no trouble whatever with my back. My general physical condition was good prior to that time. I am twenty-six pounds lighter than I was before the injury."

In his testimony Dr. G. G. Bell attributed the recurring trouble appellee had with his back to what he (Bell) called "an irritable back," and said: "That is a condition that will very likely continue the rest of his life. * * * I don't think he will ever fully recover from it." With the testimony referred to in the record, we do not think this court should say the judgment is so clearly excessive as to require that it be set aside.

The judgment is affirmed.

On Motion of Appellant for a Rehearing.

It is insisted the statement in the opinion affirming the judgment that it appeared from testimony of jurors on the motion for a new trial that the matter of attorney's fees was mentioned by one of their number, but "further appeared that there was no discussion of such matter," was "not only not supported by the record, but is in direct conflict with undisputed testimony." The statement was inaccurate. It should have been that in passing on the motion the trial court had a right to conclude from the testimony that the matter of attorney's fees was not discussed.

The motion is overruled.